Joseph E. Caceres, Esq. (SBN 169164)
Charles Shamash, Esq. (SBN 178110)
Caceres & Shamash, LLP
8200 Wilshire Boulevard, Suite 400
Beverly Hills, California 90211
Telephone: (310) 205-3400
Facsimile: (310) 878-8308

Reorganization Counsel for Debtor
and Debtor-In-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No. 1:09-bk-27368-MT |
| CHATSWORTH INDUSTRIAL PARK, LP, | Chapter 11 |
| | **DEBTOR'S REPLY TO CSFB 2003-C4 NORDHOFF LIMITED PARTNERSHIP'S OPPOSITION TO DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN; DECLARATIONS OF SHARON LYNNE BOYAR, HENRY SANDERS, AND JOSEPH E. CACERES IN SUPPORT THEREOF** |
| | **Plan Confirmation Hearing** |
| | Date:    April 28, 2011 |
| | Time:    1:00 p.m. |
| | Ctrm:    302 |
| | 21041 Burbank Blvd. |
| | Woodland Hills, CA 91367 |
| Debtor and Debtor-in-Possession. | |

Chatsworth Industrial Park, L.P. ("Debtor") hereby submits its Reply to CSFB 2003-C4

Nordhoff Limited Partnership's Opposition to Debtor's Second Amended Plan.  In support

therefore, the Debtor respectfully submits the following:

# I.

## __INTRODUCTION__

In its Opposition to the Debtor's Second Amended Plan, CSFB 2003-C4 Nordhoff Limited Partnership ("CSFB") throws out a host of often contradictory and/or misplaced arguments in its continuing efforts to effectively hijack this case and foreclose on the Debtor's valuable property.  For example, in one breath it complains about the Debtor's "excess" income going into the hands of the Debtor's principal, effectively complaining that the Debtor is retaining "too much" money, and later proceeds to claim that the plan is not feasible and that the Debtor is not likely to be able to make its plan payments.  Which is it, does the Debtor have too much money or not enough?

Similarly, CSFB continues to complain, much like it did in its objections to the Debtor's Disclosure Statement, about what the Debtor is trying to do here - retain its property while finding an allowable way under the Bankruptcy Code to pay its creditors what they are legitimately owed and entitled to, or, as the Debtor would call it, "reorganize" - as if this sort of pursuit were uncommon or outrageous.  Apparently, CSFB believes that nothing short of just giving the property back to them is sufficient.  But this is not what chapter 11 is for; if the Debtor wanted to give the property back it could do so without a bankruptcy, and would not be trying to reorganize its affairs.  Simply put, there is nothing untoward or unseemly about what the Debtor is doing, unlike the bad faith efforts of CSFB to hijack this case at every turn, first by refusing to ever give the Debtor a clear and concise accounting of amounts it claims are owed, including amounts allegedly still owing to the various reserve/escrow accounts in the case, and using that as an excuse to not reimburse the Debtor for anything in the case such as certain repairs and broker's leasing commissions; then buying claims for voting purposes to attempt to kill the case that way in the face of the Debtor's perseverance.  If anyone has acted in bad faith in this case, it is CSFB, not the Debtor.

In conjunction with its Brief in Support of Confirmation of Debtor's Chapter 11 Plan filed concurrently herewith ("Confirmation Brief"), the Debtor will show that CSFB's objections are meritless and that the Debtor's Plan, as modified on April 7, 2011, should be confirmed.

## II.

## DESCRIPTION AND BACKGROUND OF DEBTOR

## AND SUMMARY OF DEBTOR'S PLAN

**A.**    **Description and Background of Debtor**

The Debtor is a limited partnership.  Boyar Management Corp. is the Debtor's 99% General Partner, and the Sharon Boyar Trust is its 1% Limited Partner.  Sharon Lynne Boyar is the President & Sole Shareholder of Boyar Management Corp.

The Debtor owns and operates five adjacent industrial properties in Chatsworth, California located at 21026-21040 Nordhoff Street, 9035 Independence Avenue., 21019 Osborne Street, 21025 Osborne Street, and 21045-51 Osborne Street (the "Chatsworth Properties").  There are a total of 7 buildings and 9 rental units on these properties.  The buildings are cross-collateralized by the first trust deed of CSFB. The Debtor has operated these properties throughout the case on a cash flow positive basis and collected rents therefrom while making full principal, interest, and reserve/escrow account payments to CSFB for every month of the case.

The immediate cause of the filing was that pre-petition loan workout discussions with CSFB/Keybank failed to yield a positive result, forcing the debtor to seek chapter 11 bankruptcy protection.  The reasons for the Debtor's pre-petition financial problems are set forth in more detail in the Debtor's Confirmation brief and are therefore not repeated here for the sake of brevity.

In any event, upon experiencing financial problems, the Debtor contacted CSFB/Keybank immediately.  The Debtor told CSFB/Keybank its payment would be late that month.  However, CSFB/Keybank did not accommodate the Debtor at that time, and even refused to waive a late charge.  It also refused to release funds from the escrow accounts that the Debtor pays into every month for their intended purposes, such as tenant improvements, property taxes, insurance, and broker commissions.  This forced the Debtor to use rents for these and other costs, making the Debtor's situation worse.

Making matters worse, at one point a representative of Keybank told the Debtor to stop making payments and it would then be considered for a loan modification.  The Debtor was

1  eventually contacted by LNR Partners on behalf of CSFB/Keybank, and the Debtor's

2  representative actually flew to Miami to meet with them.  Unfortunately, every offer made by the

3  Debtor to resolve the problem was rejected.  Even then the Debtor managed to arrange to borrow

4  enough money from a private party to bring all payments, including late charges, up to date, but

5  CSFB/Keybank then added default interest and turned down the Debtor's offer.  The confluence

6  of the above factors led to the filing of the instant chapter 11 petition.

7      Given the foregoing set of events, it is not surprising that CSFB's intransigence and

8  unwillingness to work with the Debtor has continued on into the bankruptcy.

9  **B.    The Debtor Has Regained Its Financial Footing**

10     The respite provided by the bankruptcy has allowed Debtor to regain its financial footing.

11 First, the Debtor continued to self-manage its property to better control cash flow and

12 expenditures.  In addition, Sharon Boyar's son, Alan Smokler, has performed much of the

13 maintenance work on the property, ever since Ms. Boyar began managing the property, resulting

14 in significant savings compared to what independent contractors would charge for the same

15 work.  The Debtor was able to resume full payments to CSFB/Keybank from the outset of the

16 case, including principal, interest, and escrow payments, and is post-petition current on all such

17 payments to date.

18 **C.    Summary of Plan, Voting, Modification of Plan, and Objections to Plan**

19      **1.    Summary of Plan and Voting on Plan**

20     The Debtor's Plan provides for the payment of all administrative claims in full on the

21 effective date (unless the administrative claimant agree to different treatment, and Debtor's

22 professionals will if necessary for the Debtor to confirm its Plan, as set forth in the attached

23 Declarations of Joseph E. Caceres and Henry Sanders); provides for reinstatement of CSFB's

24 Note (with a few modifications consistent with Bankruptcy Code), and provides for an amortized

25 cure of any arrearages to CSFB in the amount determined by the Court; and provides for 100%

26 payment plus interest to unsecured creditors over 60 months from the effective date.

27     As set forth in the Disclosure Statement, the source for funding the Plan will be the

28 Debtor's ongoing rental income from its operations. As Debtor's financial projections

1   demonstrate, the Debtor will have sufficient cash flow to make its plan payments for the life of the

2   Plan, as discussed in more detail in the attached Declaration of Henry Sanders ("Sanders Decl.").

3           With regard to voting on the Plan, the Debtor received back a total of five (5) ballots

4   voting on the Plan, one from the Class 1 secured creditor (CSFB), and the other four from class 2

5   unsecured creditors.[1]  All of these ballots were received by the March 31, 2011 deadline set by the

6   Court and hence timely submitted.  Of these votes, the single vote in class 1, that of CSFB, voted

7   to reject the plan.  Of the four votes received from class 2 unsecured creditors, two were votes to

8   accept the plan and the other two were votes to reject the Plan.  See Declaration of Joseph E.

9   Caceres re Voting on Plan [Ballot Tally], filed separately and concurrently herewith ("Caceres

10   Ballot Decl.").  The 2 votes to accept the Plan were cast by the Law Offices of Ira Benjamin Katz,

11   APC, by Ira Benjamin Katz, President ("Katz"), and the law firm of Ezer & Williamson, LLP, by

12   Mitchel J. Ezer, Esq., Partner ("E&W").  However, the two votes to reject the Plan in this class

13   were cast by CSFB after it purchased the two subject claims, those of The Piken Company

14   ("Piken") and Johnson Controls, Inc. ("Johnson").  Id.[2]

15           Notwithstanding the foregoing, the Debtor believes that the cramdown provisions of

16   Section 1129(b) apply to render the Plan confirmable over the rejection of CSFB.  Moreover, with

17   respect to the claims of Piken and Johnson, the Debtor has filed Motions to Disallow both claims

18   on a number of grounds, as well as a separate motion to disqualify the two votes, with all three

19   motions set for hearing at the same time as the confirmation hearing.  At the she same time, CSFB

20   has filed a Motion for Temporary Allowance of the Piken and Johnson claims for Purposes of

21   Voting (the "Estimation Motion").  Given the foregoing, unless the Piken and Johnson claims are

22   estimated or allowed in a large enough amount, which the Debtor does not believe they will be,

23   the class of unsecured creditors has voted to accept the Plan, and the cramdown provisions will

24

25           [1]The Plan originally set forth three classes of claims and interests, one  of which was set forth as
unimpaired under the Plan and therefore deemed to have accepted the Plan (i.e., class 3), and two of

26   which were set forth as impaired under the Plan and therefore eligible to vote (i.e., classes 1 and 2).

27           [2]For purposes of full disclosure, Mr. Ezer's wife is Sharon Boyar's sister.  However, the Debtor
does not believe Ezer & Williamson, LLP, the creditor herein, is an insider under the definition set forth

28   in 11 U.S.C. § 101(31)©, as Ezer & Williamson, LLP is not (i) a general partner in the debtor; (ii)
relative of a general partner in, general partner of, or person in control of the debtor; (iii) partnership in
which the debtor is a general partner; (iv) general partner of the debtor; or (v) person in control of the
debtor.

come into play with regard to the Plan. Moreover, given the Modification to the Plan discussed

below, the Debtor believes the Plan is confirmable regardless of the outcome of CSFB's

Estimation Motion.

### 2. Modification of Plan

In addition to the foregoing, the Debtor filed its Modification to Debtor's Second

Amended Plan on April 7, 2011 (the "4/7/11 Modification") to clarify that, to the extent the

purchased claims of Piken and Johnson are allowed by the Court by final order, the secured Class

1 Claim of CSFB now includes those claims, pursuant to, among other reasons, the provisions of

the Loan Documents including, without limitation, the Deed of Trust, Assignment of Leases and

Rents, Security Agreement and Fixture Filing dated July 31, 2003 which states in applicable part:

> This Security Instrument and the grants, assignments, and transfers made in Article 1 are given for the purpose of securing the following, in such order of priority as Lender may determine in its sole discretion (the "Debt"):
>
> > (e) the payment of all sums advanced pursuant to the Security Instrument or any other Loan Documents to protect and preserve the Property and the lien and the security interest created hereby;
> > (f) the payment of all loans, debts, and advances by Lender, all liabilities and claims of any kind or nature (in contract, tort or otherwise), and costs and expenses (including reasonable attorneys' fees) incurred by Lender in connection with the Debt or any part thereof, any renewal, extension, modification, consolidation, charge, substitution, replacement, restatement or increase of the Debtor or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender and whether or not evidenced by additional promissory notes or other instruments;
> > (g) the performance of all other obligations of Borrower contained herein.

In other words, the transfer of the Piken and Johnson Controls claims to CSFB rendered

them part of the secured claim by virtue of the language of the above Loan Document. See

attached Declaration of Joseph E. Caceres ("Caceres Decl."), ¶ 2 and Exhibits "1" and "2" thereto

(respectively, copies of the 4/7/11 Modification and CSFB's Deed of Trust Dated July 31, 2003).

Further, the Debtor did not initially create a small claims class under its Plan. However, if

the Court determines that such small claims exist, the Debtor believes that a small claims class is

appropriate as, among other reasons, it will ease the unnecessary administrative burden and

expense associated with writing a number of small payments over a period of years. Accordingly,

the Plan is modified under the 4/7/11 Modification to create an unimpaired Class 2A Small

1  Claims Class, which consists of allowed unsecured claims equal to or less than $7,500, and which

2  will receive payment in full of their Allowed Claim on the Effective Date.  See Exhibit "1."

3        In addition, the 4/7/11 Modification also addresses the alternative treatment of the Piken

4  and Johnson claims (as a result of the transfer of such claims to CSFB), assuming, arguendo, that

5  the Court were to deem them unsecured (which the Debtor disputes), but nevertheless allow one

6  or the other claim for one reason or another.  In such event, the Debtor believes that separate

7  classification of such claims is appropriate on the basis, among others, that the economic

8  expectation of the general unsecured creditors in Class 2 is different than the claims purchaser.

9  The general unsecured creditors in Class 2 dealt with the Debtor and had an expectation of timely

10  payment; whereas subsequent claims purchasers did not deal with the Debtor in acquiring the

11  claims and certainly could not expect to be paid in full on normal business terms.  Hence, the Plan

12  is modified under the 4/7/11 Modification to create an impaired Class 2B Unsecured Claims

13  Purchased After the Petition Date Class, which consists of the purchased Piken and Johnson

14  claims [excluding Secured Claims included within Class 1 and Unsecured Claims that qualify

15  under Class 2A].  These claims will receive 100% payment over time with interest, in 10 biannual

16  installments as set forth in the 4/7/11 Modification.  See Exhibit "1."  As with CSFB's Class 1

17  claim, the Debtor believes that the cramdown provisions of Section 1129(b) apply to render the

18  Plan confirmable over the rejections of CSFB as successor in interest to the Piken and Johnson

19  claims, should they be in Class 2B as opposed to part of the secured Class 1 Claim

20        In summary, the 4/7/11 Modification designates five classes of claims and interests, as

21  follows.  Each claim or interest placed in a particular class is substantially similar to the other

22  claims or interests in that class, and thus the Plan satisfies Bankruptcy Code §1122. Moreover,

23  each claim or interest that is placed in a particular class is substantially dissimilar from those

24  claims or interests that have been placed in other classes.

25       **Class 1** consists solely of the secured claim of CSFB, the first trust deed holder on the

26  Debtor's property, and includes the transferred claims of Piken and Johnson.  This class is

27  impaired under the Plan and voted to reject the Plan.  However, Debtor believes this class is

28  subject to cramdown.

**Class 2** consists of all allowed general unsecured claims which are appropriately placed together in the same class.  This class is impaired under the Plan and both claims therein, Katz and E&W, voted to accept the Plan.

**Class 2A**, the Small Claim class, consists of unsecured claims equal to or less than $7,500.  The Debtor believes that a small claims class is appropriate as, among other reasons, it will ease the unnecessary administrative burden and expense associated with writing a number of small payments over a period of years.  This class is unimpaired and deemed to have accepted the Plan.

**Class 2B** consists of the Unsecured Claims Purchased After the Petition Date of Piken and Johnson, providing the alternative treatment of the Piken and Johnson claims (as a result of the transfer of such claims to CSFB), assuming, arguendo, that the Court were to deem them unsecured (which the Debtor disputes), but nevertheless allow one or the other claim for one reason or another.  This class excludes Secured Claims included within Class 1 and Unsecured Claims that qualify under Small Claims Class 2A.

The Debtor addresses such classification issues more fully in its Confirmation Brief, demonstrating that such separate classification is supported by applicable law.

**3.    Objections to Plan**

The Debtor received two objections to confirmation of the Plan, one from CSFB and one from CBI Partners.  The Debtor believes that the objection by CBI Partners will be withdrawn prior to confirmation, and is filing the instant reply to the CSFB objection.

Given the foregoing, the Debtor respectfully submits that its plan should be confirmed, as the Plan is feasible, the Debtor has obtained the acceptance of one impaired class, and the cramdown provisions of the Bankruptcy Code are met with regard to any non-consenting, impaired classes.

//

//

//

//

## III.

## THE OBJECTIONS OF CSFB HAVE NO MERIT AND THE DEBTOR'S PLAN

## SHOULD BE CONFIRMED DESPITE THOSE OBJECTIONS

**A.**     **The Plan as Modified Should be Confirmed Under Section 1129(b) of the Code with**

**Respect to Class 1 (CSFB) and Class 2B (Claims Purchased Post-Petition by CSFB)**

           **1.**     **The Plan Complies with the Provisions of Section 1129(b)(2)(A) with**

                **Respect to the Class 1 Secured Claim of CSFB**

Section 1129(b) of the Code sets forth the so-called "cramdown" provisions, which apply when not all impaired classes have voted to accept the plan.  Section 1129(b)(1) provides as follows:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph 8 are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Since subsection (a)(8) is not met with respect to all impaired classes under the Debtor's Plan as modified by the 4/7/11 Modification, specifically with respect to Class 1 (CSFB) and Class 2B (Claims Purchased by CSFB After the Petition Date), the cramdown provisions of Section 1129(b) are invoked.  The Debtor, however, believes the Plan as modified by the 4/7/11 Modification may be confirmed under Section 1129(b).

Section 1129(b)(2)(A) lists three possible treatments of secured claim; any one of them will independently satisfy the fair and equitable requirement.  <u>Arnold & Baker Farms v. Unites States</u> <i>ex rel.</i> <u>Farmers Home Admin. (In re Arnold & Baker Farms)</u>, 85 F.3d 1415, 1420 (9th Cir. 1996); <u>Wade v. Bradford</u>, 39 F.3d 1126, 32 C.B.C. 2d 568 (10th Cir. 1994) (proponent need not provide indubitable equivalent if any of other two clauses of section 1129(b)(2)(A) are met).  The plan proponent may seek to satisfy the claim in full by giving the creditor a note in the amount of the secured claim secured by the same collateral.  The plan proponent may also seek to sell the collateral free of the lien, and transfer the lien to the proceeds of sale.  Finally, the proponent may seek to give the creditor the "indubitable equivalent" of its claim.

1    Section 1129(b)(2)(A)(I) essentially allows the plan proponent unilaterally to write a new

2    loan.  This section provides that a plan is fair and equitable if:

3        (A) With respect to a class of secured claims, the plan provides -

4            (I) (I) that the holders of such claims retain the liens securing such claims,
     whether the property subject to such liens is retained by the debtor or

5    transferred to another entity, to the extent of the allowed amount of such
     claims; and

6

7            (II) that each holder of a claim of such class receive on account of such
     claim deferred cash payments totaling at least the allowed amount of such
     claim, of a value, of the effective date of the plan, of at least the value of

8    such holder's interest in the estate's interest in such property.

9    11 U.S.C. §§ 1129(b)(2)(A)(i)(II).

10    Section 1129(b)(2)(A)(i)(II) requires a present value analysis of the stream of payments

11    proposed by the plan proponent.  United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,

12    484 U.S. 365, 377, 108 S. Ct. 626, 633, 98 L. Ed. 2d 740, 752, 17 C.B.C.2d 1368, 1375 (1988)

13    (noting that "value, as of the effective date of the plan" language in section 1129(b)(2)(A)(i)(II)

14    require present value analysis).  As indicated in the legislative history, if the interest rate is

15    "market rate" then the principal of the note need only equal the allowed amount of the claim.

16    H.R. Rep. No. 595, 95th Cong., 1st Sess 414 (1977), *reprinted in* App. Pt. 4(d)(i) *infra*.  The

17    legislative history also suggest that balloon payments may be appropriate, or that a plan may adopt

18    nonstandard repayment schedules adapted to the reorganized debtor's business needs.  H.R. Rep.

19    No. 595, 95th Cong., 1st Sess. 415 (1977), *reprinted in* App. Pt. 4d(d)(i) *infra*.  Here, the Plan in

20    this case calls for a short extension of less than three years of the current balloon payment, and for

21    a payment stream consistent with Section 1129(b)(2)(A)(i)(II).

22    **1.1    The Appropriate Interest Rate for the Class 1 CSFB Secured Claim is**

23    **no more than the Contract Rate Under the Circumstances of this Case**

24    The rate of interest under the existing note is not in unity with current rates.  The "Loan

25    Terms Table" on the first page of the CSFB Promissory Note ("Note"), dated July 30, 2003, calls

26    for a fixed rate of 6.3%, amortized over 30 years, with payments of principal and interest.  The

27    Note further called for 10 years of payments, from September 1, 2003 through a balloon due

28    August 1, 2013.  See Caceres Decl., ¶ 3, and Exhibit "3" thereto (copy of CSFB Note).  Hence, the

1  current interest rate reflects market rates from several years ago prior to the current economic

2  climate, not today's current rates.

3      An analysis of the present value of the stream of payments proposed by the plan as part of

4  confirmation under Bankruptcy Code §1129(b)(2)(A) would result in a lower rate than the current

5  contract rate, even though the Debtor proposed to continue paying at the contract rate as a show of

6  good faith.  In other words, the Debtor asserts that the discount rate under current market

7  conditions is less than the contract rate.  Accordingly, the current contract rate, which the Plan

8  proposes, overcompensates CSFB on its claim.

9      The foregoing analysis is consistent with the prime rate.  The current Bank Prime rate is

10  3.25%.  A copy of the relevant spreadsheet of rates taken from the Federal Reserve's website) is

11  attached as Exhibit "4" to the Caceres Decl., ¶ 4.  The current U.S. government Federal Discount

12  rate is 0.75%.  Id.  Therefore, the Debtor believes that a rate as low as 3.25% would be

13  appropriate for the payment of Class 1.

14      The majority of Circuit Courts have apparently adopted the "market rate" standard for

15  determining the appropriate interest rate to be applied to determine the present value of an income

16  stream for purposes of confirmation.  However, such courts do not agree on what it means or how

17  it is to be determined.  Some courts simply look to current market interest rates for loans of a

18  similar type currently being made in the region.  Other courts use a formula by adding an

19  appropriate risk factor to a base rate for a "riskless" loan, such as U.S. government treasury bond

20  rates or the prime rate.  In In re Camino Real Landscape Maintenance Contractors, Inc., 818 F.2d

21  1503 (9th Cir. 1987), and In re Fowler, supra, 903 F.2d. 694 (9th Cir. 1990) (both cases decided

22  prior to Till, see analysis below), the Ninth Circuit Court of Appeals adopted a case by case

23  formula rate approach.  As stated by the Court in Fowler:

24          Having heard testimony regarding both the market interest rates in the region and
            the risks associated with this debtor, the bankruptcy court used the formula
25          approach, taking the prime rate on the date of plan confirmation, 8.75% and adding
            a .75% risk factor.  It did not err in using this approach to determine the cramdown
26          interest rate.

27  Fowler, at 697.

28      In utilizing the formula approach, the interest rate is adjusted for the term of the plan's

1   repayment period by utilizing as the base rate the yield quoted for treasury bills or bonds on

2   equivalent terms.  The risk inherent in the type of collateral involved can be accounted for by

3   utilizing an adjustment factor derived from the market for loans secured by similar collateral.

4          The market approach has sometimes been criticized, whether it be a simple market

5   comparison or a formula approach, in recognition that there is typically no real market for loans to

6   debtors in bankruptcy or loans having a 100% value ratio, as is typically the case if the secured

7   claim has been reduced to the value of the collateral pursuant to § 506.  Bankruptcy courts have

8   generally tended to reject secured creditors' arguments that the lack of an existing market for such

9   loans precludes the use of market rates for loans to creditworthy borrowers who have sufficient

10  equity cushion in the collateral.  Other courts use a market rate for the portion of the debt for

11  which a market would exist, such as that portion that would satisfy a market loan-to-collateral-

12  value ratio, and another, higher rate for the balance, perhaps the rate for a second mortgage or

13  equity investment, and then blend the two.  See, e.g., In re Boulders on the River, Inc., 164 B.R.

14  99, 105–06 (B.A.P. 9th Cir. 1994) (blending a 8.25% rate for 70% of the value and 12% for the

15  excess, yielding a blended rate of 9%).

16         In 2004, the Supreme Court addressed the crucial question of how to select an appropriate

17  interest rate for cramdown in Till v. SCS Credit Corporation 541 U.S. 465, 124 S. Ct. 1951, 1958-

18  59 (2004).  Although Till was a chapter 13 case, many Courts have applied it to chapter 11 cases

19  as well.  Till holds that a formula approach based upon the prime rate of interest best carries out

20  the intention of Congress in order to determine a whether a stream of deferred payments

21  constitutes present value of the allowed claim. 541 U.S. at 478-480, 124 S. Ct. at 1961-62.  Till

22  reversed a decision of the Court of Appeals for the Seventh Circuit that held that the pre-

23  bankruptcy contract rate should be the presumptive rate based on the theory that cramdown

24  involved imposing a coerced loan on the secured creditor.  In rejecting that the contract rate was

25  the appropriate rate, the Supreme Court preferred the formula approach, which starts with the

26  prime rate, and then adjusts the applicable rate upward.

27              [T]he resulting prime-plus rate of interest depends only on the state of financial
               markets, the circumstances of the bankruptcy estate, and the characteristics of the
28             loan, not on the creditor's circumstances or its prior interactions with the debtor.
               For these reasons, the prime-plus or formula rate best comports with the purposes
               of the Bankruptcy Code.

1  <u>Till</u> at 541 U.S. at 477; 124 S. Ct. at 1960.

2       The Supreme Court in <u>Till</u> did not directly decide the proper scale for the risk adjustment

3  factor, leaving it to a more flexible approach.  However, the Supreme Court in <u>Till</u> did offer some

4  guidance.  The Supreme Court noted that adjustments of 1 to 3 percent seemed appropriate and

5  suggested that large adjustments would not be appropriate because a plan cannot be confirmed

6  unless the Bankruptcy Court finds the plan feasible.  The Court stated:

7               If the court determines that the likelihood of default is so high as to necessitate an
                'eye-popping' interest rate , . . . the plan probably should not be confirmed.

8

9  [Till 541 U.S. at  481; 124 S. Ct. at 1962].

10       Many Courts have applied <u>Till</u> to Chapter 11 cases holding that a formula rate applies

11  unless an efficient lending market exists for the proposed exit financing.  See, <u>In re American</u>

12  <u>Homepatient, Inc.</u>, 420 F.3d 559 (6th Cir. 2005).

13       Unlike the plans at issue in many chapter 11 cases (as well as those at issue in the cited

14  case law), the <u>Chatsworth</u> case herein does <u>not</u> concern payment of a secured claim having a

15  100% loan to value ratio.  To the contrary, the uncontroverted evidence before the Court

16  establishes that the value of the Chatsworth Property is not less than <u>$12,000,000</u>, even in today's

17  market.  CSFB has introduced no evidence to refute such value, admissible or otherwise (and in

18  fact seems to accept the Debtor's valuation).  Based on the evidence before the Court, the holder

19  of the Class 1 claim enjoys at least a <u>25% equity cushion</u>, even if one accepts the exorbitant

20  almost $9,000,000 debt figure set forth in its proof of claim.  If one removes only the so-called

21  "prepayment premium" figure appearing in CSFB's claim of over $1.4 million (which has been

22  objected to, and set for hearing concurrently with the plan confirmation hearing), then the total

23  debt falls to less than $7.6 million, which means CSFB's equity cushion is about <u>37%</u>.  A copy of

24  the first 2 pages of CSFB's claim is attached as Exhibit "5" to the Caceres Decl., ¶ 5.

25       The Debtor's pre and post petition performance is further indicia of the low level of risk to

26  Class 1.  In addition to operating on a cash flow positive basis despite CSFB's intransigence in

27  refusing to pay for certain items out of the reserve accounts (such as certain repairs and leasing

28  broker commissions), the Debtor has been making timely payments on the CSFB loan.  Since the

1  Petition Date, the Debtor has made payments for every month of this case from January 2010

2  through April 2011, or 16 straight months, at the contract rate of about $67,126.99 per month to

3  CSFB, which includes about $20,000 per month into the various reserve/escrow accounts

4  provided for under the CSFB loan documents, for total payments aggregating over $1 million,

5  $1,074,031.84 to be exact, through April 2011 (with about $320,000 to the reserve accounts).

6       In summary, based on the evidence before the Court, including (1) the value of the

7  Chatsworth Property ($12,000,000 as set forth in the Disclosure Statement and in the attached

8  Boyar Decl.) and the resulting equity cushion enjoyed by CSFB of between 25% and 37%; (2) the

9  fact that the Debtor has made payments for every month of this case from January 2010 through

10 April 2011, or 16 straight months, at the contract rate of about $67,126.99 per month to CSFB,

11 which includes about $20,000 per month into the various reserve/escrow accounts provided for

12 under the CSFB loan documents, for total payments aggregating over $1 million, $1,074,031.84 to

13 be exact, through April 2011; and (3) the fact that Debtor has operated at a positive cash flow

14 throughout this case, it is clear that the appropriate interest rate to be applied to the deferred

15 payments to CSFB is no more than 6.25% under the Till formula, and should be closer to 3.25%,

16 so that the deferred Plan payments over the life of the Plan would have a present value equal to

17 the Allowed Claim.  The formula set forth by the Supreme Court in Till, of course, calls for a

18 starting point at the prime rate, and then adjusts upward for risk by adding 1-3% depending on the

19 facts of the case.  As of the date below, the current Wall Street Journal Prime rate is 3.25%, so

20 even adding the full 3% yields a rate of 6.25%.

21      Given the foregoing, it is clear that applying the current contract rate of interest of 6.3%,

22 as the Debtor has proposed, is more than reasonable and actually results in the present value of the

23 deferred Plan payments over the life of the Plan exceeding the Allowed Claim of CSFB and over

24 compensating CSFB.[3]

25 //

26

27

28     [3]The Debtor notes the proposed Plan treatment for CSFB states that "the figures utilized
herein...are subject to revision upon proof and/or order of the Court," and further states that "upon such
revision or Court order the monthly principal and interest payments due hereunder shall be recalculated."
Hence, should the Court determine that CSFB is entitled to any other amounts, the plan  has a built-in
mechanism to accommodate such amounts.

2.    **The Plan Complies with the Provisions of Section 1129(b)(2)(B) with Respect to the Class 2B Unsecured Claims Purchased Post-Petition by CSFB**

Section 1129(b)(2)(B)(i) provides that a plan is fair and equitable with respect to a class of unsecured claims if:

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim. . . .

11 U.S.C. §§ 1129(b)(2)(B)(i).

As with secured claims, this section requires a present value analysis of the stream of payments proposed by the plan proponent. As noted above, with regard to unsecured claims, the appropriate rate of interest in a bankruptcy case is the Federal Judgment Rate, as proposed in the Plan as modified by the 4/7/11 Modification. See In re Beguelin, 220 B.R. 94, 99-100 (9th Cir. B.A.P. 1998)(in chapter 11 cases involving solvent debtors, award of post-petition interest allowable at the "legal rate"; such rate is the federal judgment rate)(citing In re Melenyzer, 143 B.R. 829 (Bankr. W.D. Tex. 1992)(federal judgment rate is that in effect as of the date of filing)); In re Cardelucci, 285 F.3d 1231, 1234-1235 (9th Cir. 2002)(in adopting the reasoning of In re Beguelin, Ninth Circuit held that when a bankruptcy case is filed, "...creditors with a claim against the estate must pursue their rights to the claim in federal court and entitlement to a claim is a matter of federal law...as of the date of the petition, creditors hold a claim, similar to a federal judgment, against the estate, the payment of which is only dependent upon completion of the bankruptcy process)." However, although the Debtor believes it has proposed the proper rate of interest, the Debtor will pay allowed unsecured creditors at whatever rate the Court deems appropriate to provide them with the present value of the stream of payments to them, as set forth in the 4/7/11 Modification.

Given the foregoing, the plan is fair and equitable with respect to Class 2B.

//

//

//

//

**B.    The Plan Was Proposed in Good Faith**

Section 1129(a)(3) of the Code provides that a court may confirm a plan only if the plan is proposed "in good faith and not by any means forbidden by law." Bankruptcy Rule 3020(b)(2) provides that the Court may determine that a plan proponent proposed a plan in good faith and not by any means forbidden by law, without receiving evidence on such issues, if no party in interest has timely objected to the plan proponent's good faith. In re Warren, 89 B.R. 87, 91 (9th Cir. B.A.P. 1988). Here, although CSFB has objected to the good faith of the Plan, it has offered no evidence to support this point; rather, at bottom its argument merely reflects that it does not "like" the plan. Nevertheless, the Debtor submits that a Plan which proposes to pay all creditors, secured and unsecured (who are receiving 100% plus interest), what they are legally entitled to under the Bankruptcy Code as determined by the Court, as the Plan here does, is proposed in good faith (Debtor of course reserves the right to challenge any requested amounts, and in fact has objections to the CSFB, Piken, and Johnson claims set for hearing at the same date and time as the confirmation hearing).

The fact that CSFB is just throwing anything at the wall in the hope that something will stick is illustrated by its complaint in this section regarding the Debtor's "excess" income allegedly going to equity, while later in the feasibility section of its brief complaining that the plan is not feasible and that the Debtor is not likely to be able to make its plan payments. Which is it, does the Debtor have too much money or not enough? Moreover, putting aside for the moment CSFB's contradictory arguments, does CSFB expect this Court to believe that if the numbers were tighter it would not be kicking and screaming that the plan was not feasible? Although the Debtor understands that it cannot force CSFB to "like" or "support" its plan, CSFB's transparent arguments should be taken for what they are - a simple attack by a secured creditor against a plan it doesn't like, for purposes of killing the case and foreclosing on the property. The Debtor notes that CSFB has made no proposal, either before now or in its opposition, as to what it thinks should happen with any allegedly "excess" income. Rather, it is just throwing out hollow and contradictory complaints, and no matter what the Debtor proposed, it would throw out more. As stated in the case that CSFB itself cited, "[a] plan is proposed in good faith where it achieves a

1   result consistent with the objectives and purposes of the Code." In re Corey, 892 F.2d 829, 835

2   (9th Cr. 1989).  Clearly one of the objectives and purposes of the Code is rehabilitation and

3   reorganization of chapter 11 debtors; and for a real estate debtor to reorganize by retaining its

4   property while paying all creditors everything they are legally entitled to as determined by the

5   Court cannot be bad faith.  What CSFB is really asking this Court to accept is the untenable

6   proposition that no real estate Debtor with equity and cash flow could ever file a Plan in good

7   faith without proposing to sell its property.

8            One final point is pertinent here, regarding CSFB's complaints about the escrow/reserve

9   accounts.  CSFB continues to assert that the accounts do not have sufficient funds in them for the

10  Debtor to tap them, but it has never provided a proper accounting to the Debtor - and does not do

11  so even now - to prove this point or to indicate what other amounts might need to be paid or how

12  this situation might be handled.  Even now, in stating that the replacement reserve account "held

13  only $14,124.17," this was the alleged figure as of July 23, 2010 per CSFB's own papers.  But of

14  course we are now in April 2011.  The Debtor submits that it is CSFB that is not acting in good

15  faith.  If it were, it would have provided the Debtor with a decipherable and proper accounting of

16  these reserve accounts long ago, would not be denying reimbursement requests on the main

17  alleged grounds that the accounts do not hold sufficient funds, and would bot be buying claims as

18  a last-ditch effort to thwart a determined Debtor that has paid it over $1 million in timely

19  mortgage and escrow payments during this case.

20  **C.    The Plan Meets the Best Interests of Creditors Test**

21           Section 1129(a)(7)(A) of the Code (commonly referred to as the "best interest of creditors

22  test") requires that, with respect to each impaired class of claims or interests under the Plan, each

23  holder of a claim or interest of such class must either accept the Plan or receive under the Plan

24  property having a value, as of the Effective Date of the Plan, that is not less than the amount that

25  such holder would receive or retain if the debtor were liquidated under Chapter 7 on such date.

26  The Debtor maintains that this requirement is met here.

27           As discussed at length in the Debtor's Second Amended Disclosure Statement, the Plan

28  satisfies the best interests test as to all impaired creditors, whether or not such creditors voted to

1  accept the Plan.  The distribution to creditors is at least as much as they would receive in a chapter

2  7 liquidation, and the estate will not be burdened with the additional costs of a chapter 7 trustee

3  and the fees and costs of the trustee's professionals.

4        First, the impaired Class 1 claimant, CSFB, is receiving at least as much under the Plan as

5  it would in a Chapter 7 liquidation, even if the best interest of creditors test applies to secured

6  creditors.  As set forth therein, the Plan provides for reinstatement of CSFB's Note (with a few

7  modifications consistent with the Bankruptcy Code), and provides for an amortized cure of any

8  arrearages to CSFB in the amount determined by the Court, at an appropriate rate of interest to

9  compensate the creditor for payments over time.  As noted above, the proposed Plan treatment for

10  CSFB states that "the figures utilized herein...are subject to revision upon proof and/or order of

11  the Court," and further states that "upon such revision or Court order the monthly principal

12  and interest payments due hereunder shall be recalculated."  Hence, should the Court determine

13  that CSFB is entitled to any other amounts or a different interest rate, the plan has a built-in

14  mechanism to accommodate such amounts.

15        Second, Class 2A and Class 3 are unimpaired under the Debtor's Plan.  Hence, these

16  classes are deemed to have accepted the Plan, such that Section 1129(a)(7)(A)(I) is met with

17  respect to them.

18        Third, as set forth in more detail in Section II(C) above, under the 4/7/11 Modification,

19  both claims remaining in impaired Class 2 have accepted the Plan, such that Section

20  1129(a)(7)(A)(I) is met with respect to them as well.  Moreover, each claimant in this Class,

21  including claimants originally in Class 2 prior to the 4/7/11 Modification, are receiving 100%

22  payment of their allowed claims plus interest at the legal rate, such that they are receiving at least

23  as much as they would in a chapter 7 liquidation regardless.  See In re Beguelin, 220 B.R. 94, 99-

24  100 (9th Cir. B.A.P. 1998)(in chapter 11 cases involving solvent debtors, award of post-petition

25  interest allowable at the "legal rate"; such rate is the federal judgment rate)(citing In re

26  Melenyzer, 143 B.R. 829 (Bankr. W.D. Tex. 1992)(federal judgment rate is that in effect as of the

27  date of filing)); In re Cardelucci, 285 F.3d 1231, 1234-1235 (9th Cir. 2002)(in adopting the

28  reasoning of In re Beguelin, Ninth Circuit held that when a bankruptcy case is filed, "...creditors

1   with a claim against the estate must pursue their rights to the claim in federal court and

2   entitlement to a claim is a matter of federal law...as of the date of the petition, creditors hold a

3   claim, similar to a federal judgment, against the estate, the payment of which is only dependent

4   upon completion of the bankruptcy process).”[4]    Regardless, although the Debtor believes it has

5   proposed the proper rate of interest, the Debtor will pay unsecured creditors at whatever rate the

6   Court deems appropriate to provide creditors with the present value of the stream of payments to

7   them.

8        Finally, the impaired Class 2B claims, to the extent any exist under the 4/7/11

9   Modification, are also receiving at least as much under the Plan as they would in a Chapter 7

10  liquidation, as they are receiving 100% payment of their allowed claims plus interest at the legal

11  rate (i.e., the Federal Judgment Rate), or whatever rate the Court deems appropriate to provide

12  them with the present value of the stream of payments to them.

13       Given the foregoing, the “best interest of creditors test" is satisfied with respect to any

14  impaired creditor who did not vote to accept the Plan.

15  **D.    The Plan is Feasible**

16       Section 1129(a)(11) of the Code provides that a court may confirm a plan only if

17  "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further

18  financial reorganization, of the debtor or any successor to the debtor under the plan, unless such

19  liquidation or reorganization is proposed in the plan." Section 1129(a)(11) does not require an

20  absolute assurance of financial success by the debtor.  Rather, the feasibility standard requires

21  only "a 'reasonable' prospect for financial stability and success."  In re Sound Radio, Inc., 103 B.R.

22  521, 524 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990); accord Kane v. Johns-Manville

23  Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 649 (2d Cir. 1988) (“[T]he feasibility standard

24  is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed.");

25

26       [4]As noted on the Bankruptcy Court's website, the federal rate for judgments entered on and after
27  December 21, 2000 is based on “...the weekly average 1-year constant maturity Treasury yield, as
    published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the
    first day on which the defendant is liable for interest...”  As the Debtor filed his case on December 23,
28  2009, the applicable week was the week ending December 18, 2009.  The Federal Judgment Rate during
    that week was 0.37%, as provided in the Plan.  The Debtor requests that the Court take judicial notice of
    the foregoing information from its own website.

In re Orlando Investors, L.P., 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989) ("The purpose behind the statutory requirement of feasibility is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.") (quotations omitted).

Subject to the risks described in the Disclosure Statement, the Debtor has established compelling evidence of feasibility, as set forth in the attached Boyar and Sanders Declarations. The projections attached to the Disclosure Statement show that there is reasonable assurance that the Debtor will be able to make the distributions required under the Plan and pay operating expenses, and will not require further reorganization. Id. The Plan is not a "visionary scheme," but rather represents a good faith and reasonable resolution to this case that will repay all secured, administrative, and unsecured claims against the estate, and allow the Reorganized Debtor to continue to operate. Accordingly, the evidence supports a finding that the Plan is feasible and is not likely to be followed by the liquidation or need for further financial reorganization of the Reorganized Debtor. The Debtor notes that should the Debtor be unable to pay all administrative claims in full on the effective date, its counsel, Caceres & Shamash, LLP, and Accountant, Sanders Accountancy Corp., will agree to defer payment on their claims in some fashion (such as by deferring payment on some part of its claim until later or agreeing to accept some payments over time) so as to allow the Debtor to confirm its plan.

As previously noted, CSFB's argument that the Plan is not feasible contradicts its earlier argument that the Debtor has excess cash flow. Moreover, the other arguments CSFB relies on in arguing that the plan is not feasible are based on pure speculation, such as, for example, asserting without any basis whatsoever that since all excess funds will be distributed to equity, the Debtor will not be able to make payments under the Plan. Yet, for 16 months of this case the Debtor has made timely mortgage payments to CSFB, while maintaining the property, and all without a penny from CSFB out of the escrow/reserve accounts the Debtor is paying into (other than when CSFB paid the property tax and insurance bills for the property).

Based upon the foregoing, the Debtor believes that the Plan is feasible and that it has therefore satisfied the feasibility requirement of Section 1129(a)(11).

1

**IV.**

2

**<u>CONCLUSION</u>**

3        Based upon all of the foregoing, the Debtor respectfully requests that the Court enter its

4  order confirming the Plan.

5

6  Dated: April 14, 2011                    Respectfully submitted,

7                                           CACERES & SHAMASH, LLP

8                                                /s/ Joseph E. Caceres
                                           By:_____
9                                          Joseph E. Caceres, Esq.
                                           Charles Shamash, Esq.
10                                         Reorganization Counsel for Debtor and
                                           Debtor-in-Possession
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SHARON LYNNE BOYAR

I, Sharon Lynne Boyar, do hereby declare as follows:

1.      I am the President and sole shareholder of Boyar Management Corp., the Debtor's General Partner.  I am over the age of 18.  I have personal knowledge of the matters set forth in this declaration, except where stated to be on information and belief, and if called to testify could and would testify competently thereto.

2.      I make this declaration in support of confirmation of the Debtor's Plan of Reorganization.

3.      Description and Background of Debtor

The Debtor is a limited partnership.  Boyar Management Corp. is the Debtor's 99% General Partner, and the Sharon Boyar Trust is its 1% Limited Partner.  I am the President & Sole Shareholder of Boyar Management Corp.

The Debtor owns and operates five adjacent industrial properties in Chatsworth, California located at 21026-21040 Nordhoff Street, 9035 Independence Avenue., 21019 Osborne Street, 21025 Osborne Street, and 21045-51 Osborne Street (the "Chatsworth Properties").  There are a total of 7 buildings and 9 rental units on these properties.  The buildings are cross-collateralized by the first trust deed of CSFB 2003-C4 Nordhoff Limited Partnership/Keybank, N.A. ("CSFB/Keybank").  The Debtor has operated these properties throughout the case on a cash flow positive basis and collected rents therefrom while making full principal, interest, and reserve/escrow account payments to CSFB/Keybank for every month of the case.

The immediate cause of the filing was that pre-petition loan workout discussions with CSFB/Keybank failed to yield a positive result, forcing the debtor to seek chapter 11 bankruptcy protection.  The reasons for the Debtor's pre-petition financial problems are set forth in more detail in the Debtor's Confirmation brief and are therefore not repeated here for the sake of brevity.

In any event, upon experiencing financial problems, the Debtor contacted CSFB/Keybank immediately.  The Debtor told CSFB/Keybank its payment would be late that month.  However, CSFB/Keybank did not accommodate the Debtor at that time, and even refused to waive a late

22

1  charge.  It also refused to release funds from the escrow accounts that the Debtor pays into every

2  month for their intended purposes, such as tenant improvements, property taxes, insurance, and

3  broker commissions.  This forced the Debtor to use rents for these and other costs, making the

4  Debtor's situation worse.

5          Making matters worse, at one point a representative of Keybank told the Debtor to stop

6  making payments and it would then be considered for a loan modification.  The Debtor was

7  eventually contacted by LNR Partners on behalf of CSFB/Keybank, and the Debtor's

8  representative actually flew to Miami to meet with them.  Unfortunately, every offer made by the

9  Debtor to resolve the problem was rejected.  Even then the Debtor managed to arrange to borrow

10  enough money from a private party to bring all payments, including late charges, up to date, but

11  CSFB/Keybank then added default interest and turned down the Debtor's offer.  The confluence

12  of the above factors led to the filing of the instant chapter 11 petition.

13          4.      The Debtor Has Regained Its Financial Footing

14          The respite provided by the bankruptcy has allowed Debtor to regain its financial footing.

15  First, the Debtor continued to self-manage its property to better control cash flow and

16  expenditures.  In addition, my son, Alan Smokler, has performed much of the maintenance work

17  on the property, ever since I began managing the property, resulting in significant savings

18  compared to what independent contractors would charge for the same work.  The Debtor was able

19  to resume full payments to CSFB/Keybank from the outset of the case, including principal,

20  interest, and escrow payments, and is post-petition current on all such payments to date.

21          5.      Summary of Plan, Voting, Modification of Plan, and Objections to Plan

22                  A.      Summary of Plan and Voting on Plan

23          The Debtor's Plan provides for the payment of all administrative claims in full on the

24  effective date (unless the administrative claimant agree to different treatment, and Debtor's

25  professionals will if necessary for the Debtor to confirm its Plan, as set forth in the attached

26  Declarations of Joseph E. Caceres and Henry Sanders); provides for reinstatement of CSFB's

27  Note (with a few modifications consistent with Bankruptcy Code), and provides for an amortized

28  cure of any arrearages to CSFB in the amount determined by the Court; and provides for 100%

1    payment plus interest to unsecured creditors over 60 months from the effective date.

2    As set forth in the Disclosure Statement, the source for funding the Plan will be the

3    Debtor's ongoing rental income from its operations. As Debtor's financial projections

4    demonstrate, the Debtor will have sufficient cash flow to make its plan payments for the life of the

5    Plan, as discussed in more detail in the attached Declaration of Henry Sanders ("Sanders Decl.").

6    With regard to voting on the Plan, I am informed and believe that the Debtor received back

7    a total of five (5) ballots voting on the Plan, one from the Class 1 secured creditor (CSFB), and

8    the other four from class 2 unsecured creditors.[5]  I am further informed and believe that all of

9    these ballots were received by the March 31, 2011 deadline set by the Court and hence timely

10   submitted.  Of these votes, the single vote in class 1, that of CSFB, voted to reject the plan.  Of

11   the four votes received from class 2 unsecured creditors, two were votes to accept the plan and the

12   other two were votes to reject the Plan.  See Declaration of Joseph E. Caceres re Voting on Plan

13   [Ballot Tally], filed separately and concurrently herewith ("Caceres Ballot Decl.").  The 2 votes to

14   accept the Plan were cast by the Law Offices of Ira Benjamin Katz, APC, by Ira Benjamin Katz,

15   President ("Katz"), and the law firm of Ezer & Williamson, LLP, by Mitchel J. Ezer, Esq., Partner

16   ("E&W").  However, the two votes to reject the Plan in this class were cast by CSFB after it

17   purchased the two subject claims, those of The Piken Company ("Piken") and Johnson Controls,

18   Inc. ("Johnson").  Id.[6]

19   Notwithstanding the foregoing, the Debtor believes that the cramdown provisions of

20   Section 1129(b) apply to render the Plan confirmable over the rejection of CSFB.  Moreover, with

21   respect to the claims of Piken and Johnson, the Debtor has filed Motions to Disallow both claims

22   on a number of grounds, as well as a separate motion to disqualify the two votes, with all three

23   motions set for hearing at the same time as the confirmation hearing.  At the she same time, CSFB

24

25   [5]The Plan originally set forth three classes of claims and interests, one  of which was set forth as
26   unimpaired under the Plan and therefore deemed to have accepted the Plan (i.e., class 3), and two of
     which were set forth as impaired under the Plan and therefore eligible to vote (i.e., classes 1 and 2).

27   [6]For purposes of full disclosure, Mr. Ezer's wife is my sister.  However, the Debtor does not
28   believe Ezer & Williamson, LLP, the creditor herein, is an insider under the definition set forth in 11
     U.S.C. § 101(31)(C), as Ezer & Williamson, LLP is not (i) a general partner in the debtor; (ii) relative of
     a general partner in, general partner of, or person in control of the debtor; (iii) partnership in which the
     debtor is a general partner; (iv) general partner of the debtor; or (v) person in control of the debtor.

1  has filed a Motion for Temporary Allowance of the Piken and Johnson claims for Purposes of

2  Voting (the "Estimation Motion").  Given the foregoing, unless the Piken and Johnson claims are

3  estimated or allowed in a large enough amount, which the Debtor does not believe they will be,

4  the class of unsecured creditors has voted to accept the Plan, and the cramdown provisions will

5  come into play with regard to the Plan.  Moreover, given the Modification to the Plan discussed

6  below, the Debtor believes the Plan is confirmable regardless of the outcome of CSFB's

7  Estimation Motion.

8           B.     Modification of Plan

9           In addition to the foregoing, the Debtor filed its Modification to Debtor's Second

10 Amended Plan on April 7, 2011 (the "4/7/11 Modification") to clarify that, to the extent the

11 purchased claims of Piken and Johnson are allowed by the Court by final order, the secured Class

12 1 Claim of CSFB now includes those claims, pursuant to, among other reasons, the provisions of

13 the Loan Documents including, without limitation, the Deed of Trust, Assignment of Leases and

14 Rents, Security Agreement and Fixture Filing dated July 31, 2003 which states in applicable part:

15           This Security Instrument and the grants, assignments, and transfers made in Article 1 are
             given for the purpose of securing the following, in such order of priority as Lender may
16           determine in its sole discretion (the "Debt"):

17                   (e) the payment of all sums advanced pursuant to the Security Instrument or any
                     other Loan Documents to protect and preserve the Property and the lien and the
18                   security interest created hereby;
                     (f) the payment of all loans, debts, and advances by Lender, all liabilities and
19                   claims of any kind or nature (in contract, tort or otherwise), and costs and expenses
                     (including reasonable attorneys' fees) incurred by Lender in connection with the
20                   Debt or any part thereof, any renewal, extension, modification, consolidation,
                     charge, substitution, replacement, restatement or increase of the Debtor or any part
21                   thereof, or the acquisition or perfection of the security therefor, whether made or
                     incurred at the request of Borrower or Lender and whether or not evidenced by
22                   additional promissory notes or other instruments;
                     (g) the performance of all other obligations of Borrower contained herein.
23

24           In other words, the transfer of the Piken and Johnson Controls claims to CSFB rendered

25 them part of the secured claim by virtue of the language of the above Loan Document.  See

26 attached Declaration of Joseph E. Caceres ("Caceres Decl."), ¶ 2 and Exhibits "1" and "2" thereto

27 (respectively, copies of the 4/7/11 Modification and CSFB's Deed of Trust Dated July 31, 2003).

28           Further, the Debtor did not initially create a small claims class under its Plan.  However, if

1  the Court determines that such small claims exist, the Debtor believes that a small claims class is

2  appropriate as, among other reasons, it will ease the unnecessary administrative burden and

3  expense associated with writing a number of small payments over a period of years.  Accordingly,

4  the Plan is modified under the 4/7/11 Modification to create an unimpaired Class 2A Small

5  Claims Class, which consists of allowed unsecured claims equal to or less than $7,500, and which

6  will receive payment in full of their Allowed Claim on the Effective Date.  See Exhibit "1."

7        In addition, the 4/7/11 Modification also addresses the alternative treatment of the Piken

8  and Johnson claims (as a result of the transfer of such claims to CSFB), assuming, arguendo, that

9  the Court were to deem them unsecured (which the Debtor disputes), but nevertheless allow one

10 or the other claim for one reason or another.  In such event, the Debtor believes that separate

11 classification of such claims is appropriate on the basis, among others, that the economic

12 expectation of the general unsecured creditors in Class 2 is different than the claims purchaser.

13 The general unsecured creditors in Class 2 dealt with the Debtor and had an expectation of timely

14 payment; whereas subsequent claims purchasers did not deal with the Debtor in acquiring the

15 claims and certainly could not expect to be paid in full on normal business terms.  Hence, the Plan

16 is modified under the 4/7/11 Modification to create an impaired Class 2B Unsecured Claims

17 Purchased After the Petition Date Class, which consists of the purchased Piken and Johnson

18 claims [excluding Secured Claims included within Class 1 and Unsecured Claims that qualify

19 under Class 2A].  These claims will receive 100% payment over time with interest, in 10 biannual

20 installments as set forth in the 4/7/11 Modification.  See Exhibit "1."  As with CSFB's Class 1

21 claim, the Debtor believes that the cramdown provisions of Section 1129(b) apply to render the

22 Plan confirmable over the rejections of CSFB as successor in interest to the Piken and Johnson

23 claims, should they be in Class 2B as opposed to part of the secured Class 1 Claim.

24       The Debtor addresses such classification issues more fully in its Confirmation Brief,

25 demonstrating that such separate classification is supported by applicable law.

26              C.      Objections to Plan

27       The Debtor received two objections to confirmation of the Plan, one from CSFB and one

28 from CBI Partners.  The Debtor believes that the objection by CBI Partners will be withdrawn

1  prior to confirmation, and is filing the instant reply to the CSFB objection.

2      Given the foregoing, the Debtor respectfully submits that its plan should be confirmed, as

3  the Plan is feasible, the Debtor has obtained the acceptance of one impaired class, and the

4  cramdown provisions of the Bankruptcy Code are met with regard to any non-consenting,

5  impaired classes.

6      6.    I believe the Debtor filed its Plan in good faith.  Although CSFB has objected to

7  the good faith of the Plan, it has offered no evidence to support this point; rather, at bottom its

8  argument merely reflects that it does not "like" the plan.  Nevertheless, the Debtor submits that a

9  Plan which proposes to pay all creditors, secured and unsecured (who are receiving 100% plus

10 interest), what they are legally entitled to under the Bankruptcy Code as determined by the Court,

11 as the Plan here does, is proposed in good faith (Debtor of course reserves the right to challenge

12 any requested amounts, and in fact has objections to the CSFB, Piken, and Johnson claims set for

13 hearing at the same date and time as the confirmation hearing).[7]

14     7.    As set forth in the Disclosure Statement, I will continue to manage the Debtor's

15 affairs post-confirmation at a compensation rate of 5% of rents, and my son, Alan Smokler, will

16 continue to perform much of the maintenance, landscape and gardening work on the property at

17 the rate of $2,000 per month.  As such, compensation to me and my son has averaged between six

18 and seven thousand dollars per month during the case.  Nevertheless, we are willing to reduce

19 compensation as may be needed in any given month or months to ensure that plan payments will

20 be made.

21     8.    Subject to the risks described in the Disclosure Statement, the Debtor has

22 established compelling evidence of feasibility, as set forth in the attached Declaration of Henry

23 Sanders and discussed below.  See Sanders Decl.  The projections attached to the Disclosure

24 Statement show that there is reasonable assurance that the Debtor will be able to make the

25 distributions required under the Plan and pay operating expenses, and will not require further

26

27     _____

28         [7]The Debtor notes the proposed Plan treatment for CSFB states that "the figures utilized
       herein...are subject to revision upon proof and/or order of the Court," and further states that "upon such
       revision or Court order the monthly principal and interest payments due hereunder shall be recalculated."
       Hence, should the Court determine that CSFB is entitled to any other amounts, the plan  has a built-in
       mechanism to accommodate such amounts.

1   reorganization.  Id.  The Plan is not a "visionary scheme," but rather represents a good faith and

2   reasonable resolution to this case that will repay all secured, administrative, and unsecured claims

3   against the estate, and allow the Reorganized Debtor to continue to operate.  Accordingly, the

4   evidence supports a finding that the Plan is feasible and is not likely to be followed by the

5   liquidation or need for further financial reorganization of the Reorganized Debtor.  I note that I

6   have been informed by the Debtor's professionals that should the Debtor be unable to pay all

7   administrative claims in full on the effective date, its counsel, Caceres & Shamash, LLP, and

8   Accountant, Sanders Accountancy Corp., will agree to defer payment on their claims in some

9   fashion (such as by deferring payment on some part of its claim until later or agreeing to accept

10   some payments over time) so as to allow the Debtor to confirm its plan.  Based upon the

11   foregoing, I believe the Plan is feasible.

12        9.     More specifically, I assisted the Debtor's accountant and bankruptcy counsel in

13   preparing the projections attached to the Disclosure Statement as part of Exhibit "B" thereto.

14   Those projections are based on the Debtor's performance throughout this case, as set forth in

15   financial information provided by the Debtor, and sets forth projections on an annual basis

16   following the anticipated Effective Date, through the conclusion of the Plan payment period of

17   approximately 5 years.  The Projections assume, among other things specifically set forth therein,

18   that rents and expenses will go up by about 3% annually.  The projections started from the

19   premise that the Debtor's average rental income during 2010 was approximately $89,612 per

20   month, and took into account that the Debtor obtained a new tenant (Solutia, Inc.), starting

21   January 2011 at a total monthly rent of $9,890 including CAM charges, for a total starting point of

22   $99,502 in monthly rent starting in January 2011.  The projections also took into account that the

23   Debtor had one vacancy (out of nine units), and assumed that the Debtor would maintain that

24   vacancy rate (1/9) throughout.

25        10.    However, one of the Debtor's tenants (Surplus Sourcing) stopped paying rent this

26   year, after an issue developed with the previous guarantor on the lease and the tenant refused to

27   provide a new guarantor despite the Debtor's demands.  In any event, the Debtor is currently

28   evicting that tenant, such that rental receipts have decreased by $10,060 per month.  As such,

1 | current rent receipts are projected to be approximately $89,442, at least until the Debtor evicts the

2 | tenant and re-rents the unit.

3 |     11.    Regardless, the Debtor has operated at a positive cash flow throughout this case

4 | even at the $89,000 + level of rents, despite the bank's refusal to reimburse the Debtor for items

5 | such as certain repairs and broker's leasing commissions out of the escrow accounts the Debtor

6 | has been paying into. As such, I believe that at this level of rents the Debtor's plan is feasible,

7 | that the Reorganized Debtor is likely to maintain its going concern operations, improve its cash

8 | flow and earnings over time, and is not likely to require either additional reorganization or

9 | liquidation. Further, as stated in the Disclosure Statement and above, my son and I are willing to

10 | reduce our compensation, which has averaged between six and seven thousand dollars per month

11 | during the case, in any given month or months as may be needed to ensure that plan payments will

12 | be made.

13 |     12.    Based on my involvement with the Debtor, knowledge of the Debtor's property,

14 | and discussions with real estate brokers, I believe the Chatsworth Property is currently worth

15 | approximately $12,000,000.

16 |     13.    In addition to operating on a cash flow positive basis despite CSFB's intransigence

17 | in refusing to pay for certain items out of the reserve accounts (such as certain repairs and leasing

18 | broker commissions), the Debtor has been making timely payments on the CSFB loan. Since the

19 | Petition Date, the Debtor has made payments for every month of this case from January 2010

20 | through April 2011, or 16 straight months, at the contract rate of about $67,126.99 per month to

21 | CSFB, which includes about $20,000 per month into the various reserve/escrow accounts

22 | provided for under the CSFB loan documents, for total payments aggregating over $1 million,

23 | $1,074,031.84 to be exact, through April 2011 (with about $320,000 to the reserve accounts).

24 |     I declare under penalty of perjury that the foregoing is true and correct.

25 |     Executed on April 14, 2011 at Tarzana, California.

26 |

27 |     Sharon Lynne Boyar

28 |

29

## DECLARATION OF HENRY SANDERS

I, Henry Sanders, do hereby declare as follows:

1. I am the principal and sole shareholder of Sanders Accountancy Corp., Accountant for the Estate in this case.  I am over the age of 18.  I have personal knowledge of the matters set forth in this declaration, except where stated to be on information and belief, and if called to testify I could and would testify competently thereto.

2. I assisted the Debtor and Debtor's bankruptcy counsel in preparing the projections attached to the Disclosure Statement as part of Exhibit "B" thereto.  The projections are based on the Debtor's performance throughout this case, as set forth in financial information provided by the Debtor, and sets forth projections on an annual basis following the anticipated Effective Date, through the conclusion of the Plan payment period of approximately 5 years.  The Projections assume, among other things specifically set forth therein, that rents and expenses will go up by about 3% annually.  The projections started from the premise that the Debtor's average rental income during 2010 was approximately $89,612 per month, and took into account that the Debtor obtained a new tenant (Solutia, Inc.), starting January 2011 at a total monthly rent of $9,890 including CAM charges, for a total starting point of $99,502 in monthly rent starting in January 2011.  The projections also took into account that the Debtor had one vacancy (out of nine units), and assumed that the Debtor would maintain that vacancy rate (1/9) throughout.

3. It is my understanding that one of the Debtor's tenants (Surplus Sourcing) stopped paying rent this year, after an issue developed with the previous guarantor on the lease and the tenant refused to provide a new guarantor despite the Debtor's demands.  In any event, I am informed and believe that the Debtor is currently evicting that tenant, such that rental receipts have decreased by $10,060 per month.  As such, current rent receipts are projected to be approximately $89,442, at least until the Debtor evicts the tenant and re-rents the unit.

4. Regardless, the Debtor has operated at a positive cash flow throughout this case even at the $89,000 + level of rents, despite what I understand has been the bank's refusal to reimburse the Debtor for items such as certain repairs and broker's leasing commissions out of the escrow accounts the Debtor has been paying into.  As such, it is my opinion that at this level

1  of rents the Debtor's plan is feasible, that the Reorganized Debtor is likely to maintain its going

2  concern operations, improve its cash flow and earnings over time, and is not likely to require

3  either additional reorganization or liquidation.  Further, as stated in the Disclosure Statement and

4  in the attached Declaration of Sharon Lynne Boyar ("Boyar Decl"), compensation to her and her

5  son has averaged between six and seven thousand dollars per month during the case, and they are

6  willing to reduce compensation as may be needed to ensure that plan payments will be made.

7       5.    Based on the evidence before the Court, including (1) the value of the Chatsworth

8  Property ($12,000,000 as set forth in the Disclosure Statement and in the attached Boyar Decl.)

9  and the resulting equity cushion enjoyed by CSFB of between 25% and 37%; (2) the fact that the

10  Debtor has made payments for every month of this case from January 2010 through April 2011, or

11  16 straight months, at the contract rate of about $67,126.99 per month to CSFB, which includes

12  about $20,000 per month into the various reserve/escrow accounts provided for under the CSFB

13  loan documents, for total payments aggregating over $1 million, $1,074,031.84 to be exact,

14  through April 2011 (also as set forth in the attached Boyar Decl.); and (3) the fact that Debtor has

15  operated at a positive cash flow throughout this case, it is my opinion that the appropriate interest

16  rate to be applied to the deferred payments to CSFB is no more than 6.25%, and should be closer

17  to 3.25%, so that the deferred Plan payments over the life of the Plan would have a present value

18  equal to the Allowed Claim.  In coming to the above conclusion, I am utilizing the formula set

19  forth in the Supreme Court Till case, which I am informed and believe calls for a starting point at

20  the prime rate, and then adjusts upward for risk by adding 1-3% depending on the facts of the

21  case.  As of the date of this declaration, the current Wall Street Journal Prime rate is 3.25%, so

22  even adding the full 3% yields a rate of 6.25%.

23       6.    Given the foregoing, it is also my opinion based on the facts of this case that

24  applying the current contract rate of interest of 6.3%, as the Debtor has proposed, is more than

25  reasonable and actually results in the present value of the deferred Plan payments over the life of

26  the Plan exceeding the Allowed Claim of CSFB and ends up over compensating CSFB.

27  //

28  //

7.      Should the Debtor be unable to pay all administrative claims in full on the effective

date, my firm will agree to defer payment on its claims in some fashion (such as by deferring

payment on some part of its claim until later or agreeing to accept some payments over time) so as

to allow the Debtor to confirm its plan.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 14, 2011 at Los Angeles, California.

Henry Sanders

## DECLARATION OF JOSEPH E. CACERES

I, Joseph E. Caceres, do hereby declare as follows:

    1.    My firm is the bankruptcy attorney for the debtor.  I am over the age of 18.  I have personal knowledge of the matters set forth in this declaration, except where stated to be on information and belief, and if called to testify I could and would testify competently thereto.

    2.    Attached hereto as Exhibits "1" and "2," respectively, are true and correct copies of the Debtor's Modification to Debtor's Second Amended Chapter 11 Plan, filed April 7, 2011 (the "4/7/11 Modification"), and CSFB's Deed of Trust Dated July 31, 2003.  The Deed of Trust was taken directly from CSFB's proof of claim filed in this case on March 4, 2010.

    3.    Attached hereto as Exhibit "3" is a true and correct copy of CSFB's Promissory Note ("Note"), dated July 30, 2003.  The Note was taken directly from CSFB's proof of claim filed in this case on March 4, 2010.

    4.    Attached hereto as Exhibit "4" is a true and correct copy of the current spreadsheet of rates which I took from the Federal Reserve's website.  This sheet show that the  current Bank Prime rate is 3.25%., and the current U.S. government Federal Discount rate is 0.75%.

    5.    Attached hereto as Exhibit "5" is a true and correct copy of the first 2 pages of CSFB's proof of claim filed in this case on March 4, 2010.

    6.    As set forth in the Plan, each holder of an allowed administrative claim (i.e. , claims arising under Section 507 (a)(2) of the Code) will be paid in full on the effective date unless it agrees to a different treatment (claimants in this category are the U.S. Trustee, Debtor's Counsel, and the Debtor's Accountant).  Here, should the Debtor be unable to pay all such claims in full on the effective date, Debtor's counsel and Debtor's accountant will agree to defer payment on their claims in some fashion (such as by deferring payment on some part of their claim until later or agreeing to accept some payments over time) so as to allow the Debtor to confirm its plan.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on April 14, 2011 at Beverly Hills, California.

/s/ Joseph E. Caceres
_____
Joseph E. Caceres

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

8200 Wilshire Blvd., Suite 400, Beverly Hills, CA 90211

The foregoing documents described as Debtor's Reply to CSFB 2003-C4 Nordhoff Limited Partnership's Opposition to Debtor's Second Amended Plan; Declarations of Sharon Lynne Boyar, Henry Sanders, and Joseph E. Caceres in Support Thereof  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On ___04/14/11___ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On ___04/14/11___ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☒ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on___04/14/11___ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

**Personal Delivery:**
The Honorable Maureen A. Tighe, U.S. Bankruptcy Judge
United States Bankruptcy Court
21041 Burbank Blvd., Bin on 1st Floor outside entry to Clerk's Office
Woodland Hills, CA 91367-6606

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 04/14/11 | Elizabeth Prado | /s/ Elizabeth Prado |
|---|---|---|
| Date | Type Name | Signature |

## ADDITIONAL SERVICE INFORMATION:

### SERVICE VIA NEF:

Katherine Bunker    kate.bunker@usdoj.gov
Joseph Caceres    jec@locs.com, generalbox@locs.com
Sandi M Colabianchi    scolabianchi@gordonrees.com  --------------------attorney for CSFB
Andrew A Goodman    agoodman@goodmanfaith.com
Ira Benjamin Katz    Ikatz@katzlaw.net
Charles Shamash    cs@locs.com, generalbox@locs.com
Valerie L Smith    vsmith@gordonrees.com ------------------------------------ attorney for CSFB
United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

### SERVICE VIA U.S. MAIL:

United States Trustee:
Office of the United States Trustee
21051 Warner Center Lane, Suite 115
Woodland Hills, CA 91367

Secured Creditor:
CSFB 2003-C4 Nordhoff Limited Partnership
c/o Valerie L. Smith, Esq.
Gordon & Rees, LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111
*[Notice Address per CSFB POC#4 and CSFB Request for Notice filed 1-13-11]*